June 1808.

Browne
vs
Browne

**B. & A. C. Browne vs. R. Browne, et al.**

*A court of equity will carry into execution what appears to have been a kind of family compact for settling their property on a fair and reasonable footing.*

*Will a court of equity aid a defective conveyance, or enforce an agreement to convey land where there is no valid consideration?*

*Will a court of equity enforce a voluntary covenant to convey land?*

*Where the consideration of natural love and affection was held to be such a consideration as entitled a grantee to the aid of a court of equity to supply the defect in a defective conveyance to convey land, altho' such consideration was not expressed in the conveyance.*

*A father being seised of considerable real estate agrees not to devise it, but let it descend to his eldest son and heir at law, with an understanding & agreement with such son, that should he (the son) afterwards get title to another estate, then belonging to a third person who e devisee he expected to be, that he would then convey the estate to descended to him from his father, to his younger brothers. If after the father's death the son does get true to the estate of such third person, and executes, in pursuance of said agreement with his father, a conveyance to his brothers of the estate descended from his father, which conveyance proves to be defective, equity will remedy such defect.*

APPEAL from a decree of the court of chancery dismissing the bill of complaint of the appellants.

The bill, which was filed on the 4th of March 1797, states that a certain *James Browne* of *Glasgow,* in *Scotland,* being seised and possessed of a tract of land called *"Meagreholm,"* containing 608 acres, lying in *Queen-Anne's* county, of one other tract of land called *"Ashley,"* containing 95 acres and one half, adjoining to the first mentioned tract, and of one other tract of land called *"Hobls's Venture,"* containing 281 acres, lying in *Caroline* county, and intending to convey the same to his brothers, *Basil Browne* and *Bennett Browne* did on the 25th of July 1777, duly make and execute a *Deed Poll* or instrument of writing for that purpose, and in which is contained a covenant binding the said *James,* and his heirs, to execute any further deed or assurance that may be necessary for the more effectually conveying the said lands to his said brothers, and their heirs, as tenants in common. That the lands contained in the said deed formerly belonged to a certain *Charles Browne,* who died, leaving issue the said *James Browne,* his heir at law, and the said *Basil* and *Bennett* his younger children. That a certain *Andrew Cochrane* was also possessed of a large estate in *Britain,* and it was agreed between the said *Charles Browne* and the said *James Browne,* his heir, that the said *Charles* should leave the estate mentioned in the said deed to descend unto him the said *James,* without devising the same, or any part thereof, upon this express trust and confidence, that in case the said *James* should succeed to the estate of the said *Andrew Cochrane,* that then he the said *James* would convey the lands, which are specified in the said deed, unto them the said *Basil* and *Bennett Browne.* That the said *James* did afterwards succeed to the estate of the said *Andrew Cochrane,* and in conformity with the said

agreement with his father executed the deed before mentioned, which agreement, together with the natural love and affection he bore his two brothers, constituted the true consideration of the said deed. That said deed not being indented, acknowledged, or recorded agreeably to the directions of the laws of this state, did not operate to pass the legal title of said lands to the said *Basil* and *Bennett*, and that said *James* soon after, in 1778, died, never having been married, whereby the legal title to said lands descended unto his eldest brother *Robert Browne*, late of *Queen Anne's* county; but that said *Basil* and *Bennett* entered into and were possessed of said lands in virtue of said deed. That said *Bennett* afterwards, on the 1st of August 1788, made and duly executed his last will and testament, and thereby authorised his executors to sell said lands, if they should in their discretion find it necessary and proper, and if not he devised his moiety unto the complainants. That *Basil* also by his last will and testament, bearing date the 13th of September 1794, devised all his real and personal estate unto *Easil Browne*, one of the complainants. That both *Bennett* and *Basil* died without altering or revoking their said respective wills; and that *Robert*, the eldest brother of said *Bennett*, and the heir at law of said *James*, hath also died, leaving *Charles Browne*, (now of age,) *Basil*, *Robert*, and *Sarah Browne*, his children, to whom the legal title of the said lands have descended; but that the said *Robert*, by his last will and testament dated the 28th of May 1787, devised the said lands to be sold by his executors (*Richard B. Carmichael* and *Sarah Browne*,) for the payment of his debts. The complainants also state, that they have been informed, but cannot certainly declare, that the said *James*, in his lifetime, after the execution of the said deed, duly made his last will in writing, and devised all his estate to his mother *Priscilla Browne*, then resident of *Queen Anne's* county, who afterwards also duly made her last will in writing, and devised the same, including the legal title in the lands mentioned in the said deed, to *Elizabeth* the wife

of *Alexander Lawson* now of *Baltimore* county, (two of the defendants,) and they pray that the defendants may discover the truth thereof. That said *Sarah* died before *Robert*, and that *Richard B Carmichael* renounced the said trust, and letters of administration with the will annexed of the said *Robert* were granted unto *William Richmond* (one other of the defendants); and forasmuch as the complainants have no means of obtaining the legal title to the said lands but by the aid of this court, and the rather as the children of the said *Robert*, who are the heirs of the said *James*, and bound to fulfil his covenant for further assurances, and to whom the legal title of said lands has descended, are infants under the age of 21 years, except *Charles*. To the end &c. that the defendants may answer, &c. and that said lands may be conveyed to the complainants by the children of the said *Robert*, or by their guardian to be appointed by this court for that purpose, and such estate vested in the complainants in the same as they respectively claim and are entitled to under the wills of the said *Bennett* and *Basil*, and that they may have such further and other relief, &c. prayer for *subpena*, &c.

*The answers* of the infants, by their guardian, state, that they have no knowledge of any of the matters and things in the said bill of complaint stated but from information, &c. and the answers of the other defendants admit the facts stated in the bill. That they have no knowledge of any will being made by the said *James Browne*. That *Priscilla Browne* executed her last will and testament, dated the 29th of July 1778, which they exhibit, by which she devised the said lands to her daughter *Elizabeth* the wife of *Alexander Lawson*, during her natural life, &c.

*The exhibits* were—the deed poll dated the 25th of July 1777, which is as follows, to wit:—"To ALL TO WHOM these presents shall come. Be it known to you, that I *James Browne* the younger, of the city of *Glasgow*, *North Britain*, merchant, lawful son of *Charles Browne* of *Wye*, in *Maryland*, merchant, deceased.—Whereas the said deceased *Charles Browne*

did, some time before his death, signify to me his inclination that if I should succeed at any time to the estate of *Andrew Cochrane* of the city of *Glasgow* aforesaid, merchant, now deceased, upon that event's taking place that I should convey and make over to *Bennett Browne* and *Basil Browne,* my two brothers-german, equally betwixt them, all such plantations, lands, tenements and hereditaments, situate and being within the colony of *Maryland,* as I should succeed to in virtue of the decease of him the said *Charles Browne.* And whereas the said *Andrew Cochrane* has lately deceased, having left me his whole estate real and personal, with the burthen of paying the jointure to his widow, and a few legacies, and that I am willing to fulfil the inclination of my said deceased father; therefore know ye, that I the said *James Browne,* have granted, bargained, aliened and confirmed, and in and by these presents do grant, &c. unto the said *Bennett Browne* and *Basil Browne,* equally betwixt them, and to their heirs and assignees, all those my plantations, &c. within the colony of *Maryland,* to which I succeeded upon the death of my said father, and also the whole horses, &c. &c. To have and to hold the said plantations, &c. unto the said *Bennett Browne* and *Basil Browne,* and their heirs, to the use and behoof of them the said *Bennett Browne* and *Basil Browne,* equally betwixt them, and their heirs and assignees, for ever, &c. And I the said *James Browne,* do hereby bind and oblige myself, my heirs and successors whomever, and covenant, promise and engage, to and with the said *Bennett Browne* and *Basil Browne,* that I and my heirs shall and will, from time to time, and at all times hereafter, upon the reasonable request, and at the costs and charges in law of the said *Bennett Browne* and *Basil Browne,* their heirs or assignees, do make, execute and acknowledge, or cause to be done, made, executed and acknowledged, all and every such further and other lawful and reasonable act and acts, deed and deeds, devise and devises, in law whatsoever, for the further and better assurances and conformation of all

and singular the said plantations, &c. hereby granted, or intended so to be, with their and every of their appurtenances, unto the said *Bennett Browne* and *Basil Browne*, their heirs and assignees, for ever, as by them, or their counsel learned in the law, shall be reasonably devised, advised or required. In witness," &c. Signed and sealed by the said *James Browne*, junr. in the presence of three witnesses, one of whom was a notary public. On the back of the said deed was the certificate of *Robert Donald*, Esquire, lord provost and chief magistrate of the city of *Glasgow*, certifying and attesting, under the seal of the said city of *Glasgow*, that on the 29th of July 1777, personally came and appeared, before him, "*John Maxwell*, notary public, residing in *Glasgow*, who upon his great and solemn oath doth depose and say, that he was present alongst with *John Shanks* and *James Allen*, and did see the within named and designed *James Browne*, sign, seal, and as his proper act and deed deliver the within deed of conveyance, and that *in testimony* thereof the said *John Shanks*, *James Allen*, and this deponent, did set and subscribe their names thereto as witnesses; and this deponent saith, that the name *James Browne*, junr. appearing to be set thereto as the party executing, is of the proper hand writing of the said *James Browne*; and that the names *John Shanks*, *James Allen*, and *John Maxwell*, appearing to be set as witnesses, are of the proper and respective hand writings of the said *John Shanks*, *James Allen*, and this deponent."

The other exhibits appear as they are set forth in the bill and answers.

It was agreed between the counsel for the parties, "that *James Browne* executed the deed mentioned and exhibited in the bill; that the said *James* died and left *Robert Browne*, his eldest brother and heir at law; that the said *Robert* also died and left *Charles*, *Basil*, *Robert* and *Sarah Browne*, his children, his heirs at law. It was also admitted, that the said *Basil*, the son of the said *Robert*, died since the filing of the bill, and that *William Richmond* is administrator of the said *Robert* as stated in the bill."

HANSON, Chancellor. (7th March 1799.) "The case of the complainants, if they cannot succeed, is a hard one. It is always to be wished that what appears to have been a kind of family compact for settling their property on a fair and reasonable footing, should be carried into execution. But if the complainant's counsel are acquainted with any decision or precedent which may authorise a decree according to their wishes, it is necessary for them to apprise the chancellor where the case is to be found. Many are the cases of disappointment and hardship sustained in consequence of the neglect or failure of persons to execute deeds, or other instruments, for carrying their known and avowed intentions into effect; and the power of this court, although it has gone as far as possible without directly infringing the statute of frauds and perjuries, and disregarding legal principles, has certain legal and reasonable limits beyond which it can never go.

The claim of the complainants rests entirely, as it seems, on what they call a covenant in *James Browne's* deed, for further assurances. But was the consideration expressed in that deed such as may be deemed a valuable or valid one? Did this court ever oblige a man to do that which without any such consideration he has, by writing under seal, said he covenants to do, for a person who has neither covenanted to do any thing on his part, nor even signed the writing? Suppose *James Browne* were now alive, a citizen of *Maryland*, and seized of the lands in question, would this court, on the application of the representatives of *Basil* and *Bennett*, the grantees, compel him to convey in conformity to the said covenant? Has it ever been understood that this court, as a thing of course, obliges a man to do whatever he has by writing engaged to do? No—so far from it, this court does not enforce an agreement without a proper consideration, and there are even cases where an agreement has been made with a proper consideration, and has been fair and unexceptionable in every respect, and yet, on account of some after circumstances, this court has refused to enforce it.

The chancellor offers these remarks to the counsel in order that they may, if possible, remove the difficulties in their way."

The cause having been afterwards argued by the complainants' counsel. the chancellor, on the 28th of November 1799, decreed as follows: "That he has again carefully read and considered all the proceedings, as well as the written arguments. Conceiving the question of vast importance, not only to the complainants, and those interested under *Robert Browne*, but to the community likewise, and having no aid from the counsel of any of the defendants, he has bestowed a laborious attention on the subject. The result of his researches and reflections is an opinion that the relief prayed by the bill is unauthorised by any former decision, would be contrary to the last and best authorities, would be repugnant to law, and might afford a dangerous and mischievous precedent.

The relief is prayed on two grounds—A defective conveyance to be aided—An agreement to be enforced.

In one respect, at least, this court considers a defective conveyance, and an agreement to convey, in the same light. In each of them it requires a valid consideration as essential. Indeed, in the case of an agreement, a good, a valuable, or even adequate consideration, is not always sufficient; but the court determines, on a view of all the circumstances, whether or not it will exercise its discretion in decreeing a conveyance.

The complainants certainly cannot be in a better state than they would be in if *James Browne* were now alive, seized of the lands in fee, and the defendant in this cause.

It appears to the chancellor that the void deed made by *James Browne*, and the covenant (as it is called,) contained in that deed, must be considered as merely voluntary; that is to say, they were made from the impulse of his own will alone, and not in consequence of a previous agreement with any person whatever, and therefore this court would not have interfered to control his will.

The estate of *Cochrane* did not come to *James Browne* from the complainants, or their father, uncle or grandfather, and it is not even suggested that *Cochrane* gave *James Browne* the said estate on the condition, or with a request that he should convey to his two younger brothers the lands which his father *Charles Browne* should suffer to descend to him in *Maryland.* What then can be imagined the consideration flowing from the father, the brothers, or any other person? If *James* had those lands on condition that he should give them to his brothers, where was his advantage? It was indeed impossible; but there is nothing to induce a belief that he took them on that secret condition. Can any man seriously consider the recital, respecting the father's inclination, as conclusive of an agreement with his father to take the lands on that condition. If such was really the father's inclination, if he meant that *Basil* and *Bennett* should have the lands in the event of *James's* succeeding *Cochrane,* how strange it is, that he did not secure the arrangement by a devise or conveyance. It is possible, that a man in *his last sickness,* and not having time to execute a proper will, might express an inclination to his eldest son—but if he did, the son would not be legally bound, and whatever conveyance of land, which had descended to him from his father, he might think proper to make to a brother or sister, would be considered as voluntary. This, at least, is the idea of the chancellor.

It does not to the chancellor seem clear from the books, what are the defects in a deed *made on the best consideration,* which this court will supply merely on the idea of supplying the defect, but whatever they are, it is necessary, as has already been intimated, that there be a valid consideration in the defective deed.

There is a wide difference between a consideration which will suffice to give operation according to the intent of the grantor, to a deed duly executed, acknowledged and recorded, and a consideration which will entitle the grantee to the aid of this court to sup-

ply the defect of a deed. Had the deed of *James Browne* been indented, acknowledged, and recorded according to law, there is no doubt, except that which might arise from the circumstance of his being a *British subject,* that it would have operated according to his intent. But not having been either indented, acknowledged or recorded, it is the same thing as if it never had been made. It was, it is repeated, merely voluntary; he had no effective consideration for it; and he could not have been compelled to make it, if even the inclination of his father had been expressed under his hand and seal.

How numerous are the cases, and how deplorable many of them are, where a man makes a voluntary promise, breaks his word, and almost the heart of the party, and yet passes with legal impunity! It is not contended, that, in this respect, the law is right; but it is notorious that so the law is. Can then a reason be assigned why a man executing a voluntary defective conveyance shall be compelled to execute an effective deed, when if he had only made a voluntary promise to execute such a deed he would not be compelled? There can be no sensible, substantial distinction between the cases; and the covenant in the present case is merely a voluntary promise to convey. The consideration (if such it can be called,) of the defective conveyance, and the consideration for the covenant, being one and the same, viz. the inclination of the father.

It has however been said, that there was a valid consideration, although not expressed; and that when a consideration exists, it is immaterial whether or not it be expressed. The chancellor conceives, as matters stand, that it is unnecessary to examine whether or not the consideration of natural love and affection be such a consideration as will entitle the grantee to the aid of this court to supply a defect. He conceives that the consideration of natural love and affection is out of the question, because it has not been expressed in the deed; and not being expressed, it is not to be supposed to have operated. The doctrine of

the counsel appears novel and strange, when applied to a deed which plainly expresses the consideration or motive for making it. It is wisely said by a late elegant writer on equity, "that a court of equity, no more than a court of law, shall supply a will (or intent) for the grantor. It will only do that which it is manifest the grantor would have done had not the mistake been made." That is as much as to say, this court shall not presume to assign an intent, or consideration, or motive, when the real intent, or consideration or motive, is plainly expressed. When no consideration whatever is expressed, there may be plausibility in asserting that the consideration of a deed from one brother to another was natural love and affection. It may be there said that the consideration is to be sought. But when that consideration was omitted, and yet the grantor thought it necessary or proper to express a consideration, with what propriety can any tribunal whatever say, or indeed, how can it believe, that natural love and affection was the motive? Suppose *James* to be the defendant, called on to execute a good deed—his very opposition to the bill would prove that natural love and affection were out of the question, or that, even if it operated at the time, he has since changed; and he ought to be as free now, as he was at the time of making the deed, nay, it is doubtful, under all the circumstances disclosed by the bill and answers, whether or not *James Browne* really intended that the deed should operate in favour of his brothers." Bill *dismissed*, but without costs. The Complainants appealed to this Court.

*Shaaff*, for the Appellants. The chancellor in his decree has stated this to be a case of much hardship, but has considered himself bound by the rules of law to deny the relief prayed. It surely would be greatly to be lamented if the law had made no provision in such cases as the one before the court. The principles of a court of equity are not in this instance at war with the ordinary maxims of common justice, and it can be shewn that, according to the nature of this court,

and in conformity to former determinations, the complainants ought to have obtained the object of their application, and that the present decree should be reversed.

The statement of the bill is unquestionably true, and is fully proved by the recital in the deed. The grantor *(James Browne,)* there states. that he succeeded to the estate under a will. or as heir to *Charles Browne*, that in his life-time *Charles Browne* expressed his inclination, that if he, *James*, succeeded to *Cochrane's* estate, he should convey to *Bennett* and *Basil Browne* any estate he should succeed to by *Charles's* death. At this time the fee was in *Charles Browne*, and it must have been wholly optional whether he would suffer the estate to devolve on *James* or not. It is therefore evident that *James* must have agreed to accept the estate on these terms, otherwise it is not presumable but that *Charles* would have made a different disposition of the estate. It is here to be remarked, that the deed exhibited is, by an agreement in the cause, admitted to have been executed by *James Browne;* and since the complainants are those entitled to the estate of *Bennett* and *Basil Browne*, and the defendants are those who have the legal estate of *James Browne*, the grantor, by descent or devise, the cause is to be considered in the same manner as if the bill had been filed by the original grantees against the grantor in the deed. It therefore follows, that the recital in the deed is good evidence of what is recited; and as in the present instance the recital stands not contradicted by other evidence, it must be taken as true. No principle of evidence is better established than that the recital in a deed is evidence against *"the parties and those claiming under them."* The only question that can occur in this case is, whether the deed is made under such circumstances that the court will aid its defects. There is no doubt but that chancery has the general power to aid defects in conveyances when made on proper consideration. So many instances of this kind daily occur, that it would be waste of time to re-

fer to authorities. Chancery will aid a mistake in a conveyance, as if the name of the lessor or lessee is omitted. So if, in a feoffment. livery is omitted, or if a bargain and sale *is not enrolled.* Many cases of this kind are collected in 2 *Com. Dig.* 170, 171, 172, 173. With respect to conveyances wholly voluntary, courts of chancery have generally left them to their legal operation, without affording any aid. The conveyance in this case may be considered in two points of view.

1. As being made on a good consideration, and 2. As being made on a valuable consideration.

*First point.* Had the present deed been made by *Charles Browne,* the father of the grantor, to his sons *Basil* and *Bennett,* there could have been no doubt. Defective conveyances, by parents, as a provision for children, have been often aided in this court. The principle has been recognized by our court in the case of *Pitsel's heir vs. Pitsel,* decreed about five years ago, and also 1 *Fonb. Eq.* 341. 1 *Vern.* 132. 2 *Com. Dig.* 122, 126. Thus stands the law as between a parent and a child, and the principles of equity equally apply to *brothers and sisters.* This subject will be much elucidated by an examination into the law of uses both before and after the statute of uses—*27th Hen. VIII. ch.* 10. Before that statute it is certain that the *cestui que use* had no legal estate in the land; that his estate was only in equity, and his remedy in equity; and that such remedy was allowed is unquestionable. It is also equally certain, that since the statute, a bargain and sale, or a covenant to stand seised to uses, which do not operate by way of transmutation of possession, will not raise a use except there be a consideration—3 *Bac. Ab.* 362. The reason of which determination is, that after the statute no estate was executed except for such use as the party could have had before; of course if there could be no use before, none could be executed after the statute. If it can be established that before the statute, the relationship of brothers was a sufficient consideration to raise a use, then in this case a sufficient

consideration is proved; because as the *cestui que use* had no legal estate, but only a title in equity, he would not be entitled to the aid of a court of chancery, except he shewed a *good* or *valuable consideration* to raise the use. Here the authorities are decided, that the consideration of blood, as between a parent and a child, or brothers, is sufficient to entitle a man to the aid of chancery. If a man parts with land in advancement of his issue, and to provide for the conveniencies and necessary settlements of his family, it is fit the chancery should make them good conveyances where they want legal validity, &c. Therefore, if a man, in consideration of natural love and affection, covenants to stand seised to the use of a son or brother, this is a good use—5 *Bac. Ab.* 362. Fraternal love, &c. is a good consideration to raise a use by way of covenant; for this is a consideration of blood, and a brother is next in degree after parents and children, &c. 5 *Bac. Ab.* 363. From these, and many other authorities, it appears that the consideration of blood between brothers is sufficient to raise a use on a covenant to stand seised; and if this reasoning is correct, it clearly establishes that there is no want of consideration in this case; because the grantor and grantees in the deed are brothers; and it also appears that that relationship would form a sufficient consideration to raise a use on a legal conveyance under the statute, and of course a sufficient consideration to justify the interposition of this court, independent of that law, no change in this respect being made by it. It may then be assumed as a *concessum*, that the consideration of blood between brothers is a sufficient consideration to justify the court of chancery in remedying the defects of a conveyance. It will only remain to be proved, that the court can in this case take notice of this consideration, although it is not expressed in the deed. The true distinction which governs in these cases is, that you cannot aver any consideration that contradicts a deed, but you are at liberty to aver any consideration that will stand with it; for example, if the deed states a pecuniary

consideration you shall not be permitted to allege that money did not. form part of the consideration, but you may aver that something else, together with money, made the consideration. The English authorities decidedly prove this point, although the chancellor in his decree holds out a different opinion. A bargain and sale, in consideration of £70, it may be averred that it was made in consideration of marriage as well as £70. 1 *Co.* 176. 1 *Bac. Ab.* 275, 276.

*Second point.* That there is *a valuable consideration.* It must be remarked, that no person in the relation of creditor or purchaser is in any manner to be affected by the relief prayed for; if there was it might be a sufficient answer to the present application. On reflection there will be found a complete valuable consideration to support this conveyance, without taking into view the relative situation of the parties to the deed. When a man is under a moral obligation to do any thing, although he cannot be compelled to do it in any court either of law or equity, and promises to do it, the honesty and rectitude of the thing is a consideration—*Cowper,* 290. Let this case be tried by that rule. *Charles Browne* had three sons, *James,* his heir, and two infant sons, *Basil* and *Bennett. James* was heir expectant to *Andrew Cochrane. Charles Browne* told his son *James,* that in case he succeeded to *Cochrane's* estate, he should convey the estate he suffered to descend to him, *(James,)* to his brothers *Basil* and *Bennett.* This *James* agrees to, because *Charles's* estate is permitted to descend to him. *James* does afterwards succeed to *Cochrane's* estate. On the happening of this event *James* was surely under every moral obligation to make the conveyance to his brothers. It was under this confidence that he was suffered to inherit his father's estate, and it would have been a violation of the most sacred duty if he had not complied with the injunction of his father. *James* appears to have seen this subject in a proper point of view, by executing the deed in question. But unfortunately, through ignorance of the law, it was not so completed as to pass the legal estate,

by which means, if it is not remedied by this court, his younger brothers will be left without any provision, and the benevolent intention of his father wholly frustrated. This would create a good consideration to support any subsequent conveyance from *James* to his brothers *Basil* and *Bennett*, and would have been sufficient to justify the court in decreeing a specific performance, had the case rested alone on a covenant to convey. If the executors of *James Browne* were in *America*, and suit was brought on the covenants in this deed, can there be a doubt but, that under the circumstances of the case, the measure of damages would be the value of the land? It is no objection to the relief to say that the transactions which formed the consideration of the contract was between *Charles Browne* and *James Browne*, in which *Basil* and *Bennett* had no agency; because, although not present, the object contemplated was for their benefit. Cases of a similar nature have already been determined. Defendants' father, who was also father to plaintiff's wife, was about to cut £1000 worth of timber off an estate which was to descend to defendant. The £1000 to be a portion for a daughter, defendant's sister. The defendant promised the father to pay the £1000 to his sister, provided the father did not cut the timber. The sister, and not the father or his executors, must bring the suit. *Dutton vs. Poole*, 1 *Vent*. 318. 1 *Esp.* 106. A physician was promised a sum for himself, and another for his daughter, if he performed a cure. The daughter may have assumpsit. *Ibid.* So in the present case, *Basil* and *Bennett Browne*, being children of *Charles*, and the arrangement being for their benefit, they are not strangers to the consideration. *James's* deed is afterwards made immediately to *Basil* and *Bennett*. The analogy between the consideration of the promise in the case of *Dutton vs. Poole*, and the present case is striking. There land with the timber on it would have descended to the heir, but the ancestor could have broke the descent when he chose; he was about to fell timber for a daughter's provision, amounting to £1000

The heir promised the ancestor, (his father,) that he would pay the daughter the £1000 if he did not fell the timber; and the daughter, his sister, recovered. In the present case the land would have descended to *James Browne,* but the descent might have been broken by *Charles Browne,* the ancestor; he agreed that the land should descend to *James,* but *James* was to convey it to *Basil* and *Bennett* on the happening of a certain event, which afterwards did happen. It would appear strange if a transaction of this nature was destitute of consideration, or that any contract made by *James Browne* in compliance with the solemn requisition of his father, and with the terms on which he inherited his estate, should be considered as a *nudum pactum.* The reasoning on this subject seems to be conclusive in favour of the present application; and on examination it will be found, that courts of equity have extended their aid to cases much less favourable than the present. "An heir claiming title to land, threatened to evict the tenant in possession, who also claimed title. The tenant agreed that if he died without issue to leave the land, or £500, &c. This agreement was carried into effect against the devisee of the tenant." 1 *Vern.* 48. If an uncle, in consideration of natural love and affection, and in order to gain a reconciliation between the nephew and the father, (whom the nephew had disobliged,) covenants to settle his estate on the nephew. This agreement shall be executed in specie. 2 *Com. Dig.* 122. 1 *Chan. Rep.* 158. The present is a much stronger case for relief, than the one just referred to. For these reasons, the complainants think themselves entitled to have the relief prayed for, and that the decree of the chancellor ought to be reversed.

*Winchester,* for the Appellees *(a)*.

THE COURT OF APPEALS, [*Rumsey*, Ch. J. *Mackall*, *Jones*, *Potts* and *Dennis*. J.] at this term, (June 1803,) *reversed* the decree of the court of chancery, and "adjudged, &c. that the chancellor pass a decree thereby ordering and decreeing that the appellee *Charles Browne*, for himself, and the infant defendants, *Robert* and *Sarah Browne*, by their guardian or guardians, to be appointed by the chancellor for the purpose, shall by a good and sufficient deed or deeds of bargain and sale, to be duly executed, acknowledged and recorded, convey unto the complainant, *Basil Browne*, and his heirs, three undivided fourth parts of all the following tracts or parcels of land, to wit: A tract or parcel of land called *Meagreholm*, containing 608 acres of land, lying in *Queen-Anne's* county; one other tract or parcel of land called *Ashley*, containing 95 acres and one half acre, adjoining to the said first mentioned tract; and one other tract of land called *Hobb's Venture*, containing 281 acres, lying in *Caroline* county, which are the same lands intended to have been conveyed by the deed executed by *James Browne* to *Bennett* and *Basil Browne*, and dated on the 25th of July 1777, and exhibited in the bill in this cause filed—And ordering and decreeing, that the said *Charles Browne*, for himself, and the infant defendants, *Robert* and *Sarah Browne*, by their guardian or guardians by the chancellor for that purpose to be appointed, convey to the other complainant, *Andrew Cochrane Browne*, and his heirs, by a good and sufficient deed or deeds of bargain and sale, to be duly executed, acknowledged and recorded, the remaining undivided fourth part of the said three tracts of land above described. And it is adjudged, &c. that each party pay their own costs, as well in the court of chancery as in this court."